IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UTAHNS FOR ETHICAL GOVERNMENT, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>PAUL B. BARTON, et al.,<br><br>Defendants. | ORDER and MEMORANDUM DECISION<br><br><br><br>Case No. 2:10-cv-333 |

**INTRODUCTION**

This matter is before the court on the motion of the Defendants the Honorable Utah Lieutenant Governor, Greg Bell, and the Honorable Utah Attorney General, Mark Shurtleff, to vacate the preliminary injunction previously issued in this action. Plaintiff Utahns for Ethical Government and others originally brought an action seeking a declaration that Utah Code, section 20A-7-206(8)[1] unconstitutionally infringes on Free Speech. They also sought to enjoin the defendants from administering, enforcing, or otherwise following that section of the statute.[2] The court heard oral argument and granted a motion for a temporary restraining order on April 15, 2010.[3] The court heard

---

[1] The statute reads: "Initiative packets are public once they are delivered to the county clerks."
[2] (Compl.) (Dkt. No. 1).
[3] (Order Granting TRO) (Dkt. No. 18).

evidence and further argument on whether the temporary restraining order should be continued as a preliminary injunction on April 28, 2010, and the order was extended pending further consideration by the court of the request for preliminary injunction.[4] On June 2, 2010, the court issued an order continuing the temporary restraining order as a preliminary injunction, pending resolution of *John Doe #1 v. Reed*[5] by the United States Supreme Court, which the court noted would very likely directly control the ruling to be issued in the present case.[6]

*Reed* was decided on June 24, 2010. In response to *Reed*, Defendants filed a motion to vacate this court's preliminary injunction on July 13, 2010 and briefing on the motion concluded on October 18, 2010. Oral argument was held February 25, 2011. The court is now asked to determine whether, in light of *Reed*, a sufficient basis remains for leaving the preliminary injunction in place. For the reasons discussed below, the court concludes the preliminary injunction should remain in place due to Plaintiffs' "as applied" challenge.

## **BACKGROUND**

**UEG's Petition**

Utahns for Ethical Government ("UEG") is a political issues committee, organized pursuant to Utah Code, section 20A-11-801.[7] "UEG is the organizational force behind an initiative petition, 'Government Ethics Reform,' designed to create an independent ethics commission and code of ethics respecting the Utah state legislature" ("the Petition" or "the UEG Petition").[8] UEG initially

---

[4] (Minute Entry) (Dkt. No. 37).
[5] *John Doe #1 v. Reed*, 130 S. Ct. 2811 (2010).
[6] (Order Granting Prelim. Inj., 3) (Dkt. No. 44).
[7] (Compl. ¶ 1.)
[8] *Id.*

2

sought to qualify the Petition for placement on the November 2010 ballot. In order to do so, UEG was required to collect signatures from a specified portion of the voting public in Utah on a county by county basis by April 15, 2010.[9] Pursuant to statute, all signers of the Petition were required to print their names, sign their names, and provide addresses.[10]

As the April 15 deadline was approaching, Plaintiffs were mindful of the requirements of Utah Code, section 20A-7-206(8),[11] which would make public the names and addresses of all signers of the Petition. Fearing that the prospect of such a disclosure might discourage potential supporters of the Petition,[12] UEG filed a complaint with the court on April 14, alleging that section 20A-7-206(8) was unconstitutional both on its face and as applied to the Petition signers.[13]

On April 15th, UEG submitted the signatures it had collected, but had failed to gather a sufficient number to qualify the initiative for the 2010 ballot.[14] UEG continued, however, to collect signatures in the hopes of meeting the signature quota for the 2012 ballot, based on its understanding that Utah Code, section 20A-7-202(a) afforded UEG one year after petition submission to gather the needed signatures (which period would end August 12, 2010), regardless of whether the signatures were ultimately used to support a 2010 or a 2012 ballot measure.[15] By August 12, 2010, Plaintiffs believed that they had collected and submitted sufficient signatures to place the measure on the 2012

---

[9] UTAH. CODE. ANN. § 20A-7-206(1).
[10] *Id.* § 20A-7-203.
[11] The relevant provision was changed from subsection (7) to subsection (8) during the last legislative session. At the time the complaint was filed, the provision was still subsection (7).
[12] (Pls.' Resp. Defs.' Mot. Vacate Prelim. Inj., 6.) (Dkt. No. 48).
[13] (Comp. ¶ 31.)
[14] (Pls.' Resp. Defs.' Mot. Vacate Prelim. Inj., 5.)
[15] *Id.* at 5–6.

ballot.[16] Their interpretation of section 20A-7-202(4), however, is disputed by Defendants.[17] Defendants contend that section 20A-7-202(4) requires that if a deadline is missed for submission of signatures, a party must start over collecting signatures for the next ballot.[18] This is a question of state law, and thus not before the court.

Currently, UEG intends to take its dispute to state court to resolve how section 20A-7-202(4) should be interpreted. In the meantime, the Office of the Lieutenant Governor has instructed the county clerks, who are tasked with the counting and certification of signatures, not to certify signatures received after April 15, 2010 until the dispute is resolved.[19]

**John Doe # 1 v. Reed**

The facts of *Reed* were closely parallel to the facts in the case at hand, involving an initiative petition ("Petition R-71" or "R-71") and a compelled disclosure statute in the state of Washington.[20] If successful, R-71 would give Washington voters the opportunity to vote on SB 5688, a bill that "'expand[ed] the rights and responsibilities' of state-registered domestic partners, including same sex domestic partners."[21] Petition R-71 was successful, and the initiative appeared on the November 2009 ballot, at which time "voters approved SB 5688 by a margin of 53% to 47%."[22]

By August 20, 2009, however, several months before the vote took place, the Washington Secretary of State had received requests for copies of R-71 under authority of the Washington Public

---

[16] *Id.* at 6.
[17] *Id.*
[18] *Id.*
[19] *Id.* at 30 (Exhibit B).
[20] *John Doe #1 v. Reed*, 130 S. Ct. 2811 (2010).
[21] *Id.* at 2816.
[22] *Id.*

Records Act ("the PRA"), which "makes all 'public records' available for public inspection and copying."[23] In response, the plaintiffs, who sponsored R-71, filed a motion for a preliminary injunction, seeking to enjoin the disclosure of the petition on the grounds that the PRA was unconstitutional, both facially and as applied, because it violated the First Amendment when applied to signers of petitions.[24] The injunction was granted by the district court on the theory that the PRA was facially unconstitutional because it burdened the "core political speech" of those who signed it.[25] The Ninth Circuit, reviewing only the facial challenge, reversed, and an appeal to the Supreme Court followed.[26]

The Supreme Court issued an opinion on June 24, 2010. The majority opinion held that the proper standard for evaluating the compelled disclosure of petition signatures is "exacting scrutiny," which requires the state to demonstrate a "'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest."[27] To satisfy this standard, "'the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.'"[28]

The government advanced two interests as justifications for the PRA: the interest in (1) "preserving the integrity of the electoral process" and (2) "providing information to the electorate about who supports the petition."[29] The Court held that protecting the integrity of the electoral

---

[23] *Id.* (citation omitted).
[24] *Id.*
[25] *Id.* at 2817.
[26] *Id.*
[27] *Id.* at 2818 (quoting *Citizens United v. Federal Election Comm'n*, 130 S. Ct. 876, 914 (2010)).
[28] *Id.* (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 743 (2008)).
[29] *Id.* at 2819.

process was a sufficiently important governmental interest, and thus did not address the proffered "informational" interest.[30] The government's interest in electoral integrity was served by disclosure, the Court held, because disclosure tended to help combat fraud, detect invalid signatures, and foster government transparency and accountability.[31]

Moving to consideration of the burden the PRA placed on speech, the Court noted two principles applicable to the context of compelled disclosure that tended to diminish the impact of the PRA on First Amendment rights: (1) states are allowed "significant flexibility in implementing their own voting systems" and (2) "disclosure requirements may burden the ability to speak, but they . . . do not prevent anyone from speaking."[32] Despite these thumbs on the scale in favor of disclosure, the Court held that the burden on First Amendment rights presented by the PRA could become serious enough to outweigh the government interest in electoral integrity if "those resisting disclosure . . . can show 'a reasonable probability that the compelled disclosure [of personal information] will subject them to threats, harassment, or reprisals from either Government officials or private parties.'"[33] The Court noted that plaintiffs had made arguments in support of such a probability, but only as applied to Petition R-71. Because the Court was reviewing a facial challenge, however, "[t]he question . . . [was] not whether PRA disclosure violates the First Amendment with respect to those who signed [R-71] . . . . The question instead [was] whether such disclosure in general violates the First Amendment rights of those who sign referendum petitions."[34]

---

[30] *Id.*
[31] *Id.* at 2820.
[32] *Id.* at 2819.
[33] *Id.* at 2820 (quoting *Buckley v. Valeo*, 424 U.S. 1, 74 (1976) (per curiam)).
[34] *Id.* at 2820–21.

Plaintiffs had failed to provide evidence tending to support a reasonable probability of reprisal against petition signers generally.[35] Thus, when balanced against the burden that the PRA imposed on First Amendment rights generally, the Court held that the PRA survived exacting scrutiny on its face.[36]

The Court noted, however, that "upholding the law against a broad-based challenge does not foreclose a litigant's success in a narrower one."[37] To succeed in such a challenge, plaintiffs needed to show a reasonable probability of reprisal against the signers of R-71 only, as opposed to petition signers generally.[38] The majority opinion concluded with an acknowledgment of plaintiffs' right to "press their narrower challenge" before the District Court,[39] which they are currently doing.

## DISCUSSION

### I. PLAINTIFFS' FACIAL CHALLENGE

*Reed* mandates the rejection of Plaintiffs' facial challenge. The Government in the case at hand has alleged an interest identical to the interest found sufficient in *Reed*: the interest in electoral integrity, or more specifically, in preventing fraud, mistake, and promoting governmental transparency and accountability.[40] Despite the Supreme Courts unequivocal holding that, generally, there is a link between disclosure and electoral integrity, Plaintiffs argue that section 20A-7-206(8) does not serve that interest. This argument is based primarily on two grounds: (1) "Utah's traditions

---

[35] *Id.* at 2821.
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] (Defs.' Reply Mem. Supp. Mot. Vacate Prelim. Inj., 6) (Dkt. No. 57) (noting that these were the "interests that the State Defendants have asserted throughout this entire proceeding as justifying the disclosure requirement").

7

respecting secrecy in the electoral process show that, as a matter of public policy, the state has selected voter anonymity, rather than the disclosure of names, as the preferred means to achieve the end of honest elections"[41] and (2) the historical evidence of petition disclosure in Utah, which shows that the only people who have asked for petition information are those seeking to contact petition signers, not people seeking to assist in the detection of fraud.[42]

Plaintiffs' argument appears to conflate the nature of an "as applied" challenge with a facial challenge. A similar confusion existed in *Reed*. Plaintiffs in *Reed* attempted to frame the issue of the application of a mandatory public disclosure statute to referendums as an as-applied matter, rather than facial.[43] The Court noted that the claim

> [O]bviously has characteristics of both: The claim is "as applied" in the sense that it does not seek to strike the PRA in all its applications, but only to the extent it covers referendum petitions. The claim is "facial" in that it is not limited to plaintiffs' particular case, but challenges application of the law more broadly to all referendum petitions.[44]

The Court went on to note, however, that the "label is not what matters."[45] Instead, what matters is whether the claim "reach[es] beyond the particular circumstances of these plaintiffs."[46] If so, Plaintiffs "must satisfy [the] standards for a facial challenge to the extent of that reach."[47]

---

[41] (Pls.' Resp. Defs.' Mot. Vacate Prelim. Inj., 10–11) ("Section 20A-7-206(7) isn't designed to facilitate public assistance in the detection of fraud, and this conclusion is bolstered by an overriding state constitutional policy choice that keeping voters' consciences private is more likely to enhance electoral integrity, whereas making voter choices public may be counterproductive to that end.")
[42] *Id.*
[43] *Reed*, 130 S. Ct. at 2817.
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*

Here, Plaintiffs' claim clearly reaches beyond the facts of their particular situation, attempting to disqualify electoral integrity as a legitimate interest that can justify application of section 20A-7-206(8) to petitions generally. This claim, however, is not easily harmonized with the pronouncement in *Reed* that, as a general matter, disclosure is substantially related to the legitimate interest of preserving electoral integrity.[48] The reason that relationship exists, the Court explained, is because disclosure can help prevent fraud and detect invalid signatures.[49] It also promotes governmental accountability and transparency.[50] Thus, only if Plaintiffs can explain how, as a general matter, disclosure does not lead to the prevention of fraud or mistake, or foster transparency and accountability in Utah, can they have a basis for challenging the legitimacy of the disclosure statute on its face.[51]

Neither of Plaintiffs' arguments suffice to show that disclosure could not serve to promote electoral integrity in Utah as a general matter. First, noting that the privacy of the voter's conscience is held sacred in Utah does nothing to negate the proposition that allowing public access to petition records can or will help prevent fraud or detect invalid signatures. Even if the construction of Utah's election policy is accepted as accurate, simply because the state prefers privacy does not mean that a lack of privacy precludes spotlighting errors in the referendum process. Second, Plaintiffs'

---

[48] *Id.* at 2820 ("[W]e . . . conclude that public disclosure of referendum petitions in general is substantially related to the important interest of preserving the integrity of the electoral process.").

[49] *Id.* ("Public disclosure . . . helps ensure that the only signatures counted are those that should be, and that the only referenda placed on the ballot are those that garner enough valid signatures.").

[50] *Id.*

[51] There is a difference between arguing that disclosure does not prevent fraud and that the prevention of fraud is not a legitimate government interest. The former can be contested as a general matter, but would require an extraordinary factual showing. The latter is beyond dispute after *Reed*.

historical claims about the purpose for which the statute has been used in the past do nothing to indicate a broken link between disclosure and its integrity enhancing outcomes. The Court in *Reed* required no showing that the public had used disclosed petition information in the past to discover fraud or otherwise assist in the process.[52] The mere fact that public involvement could help prevent fraud was enough, without any showing that it had actually happened.[53]

In short, Plaintiffs have done nothing to negate the connection between disclosure and the prevention of fraud or mistake, and the fostering of governmental transparency and accountability as a general matter. Thus, despite Utah's alleged preference for voter privacy, and despite historical use of petition records, Utah has, as a general matter, a legitimate interest in requiring disclosure.

Plaintiffs may still, however, succeed in a facial challenge if they can show a reasonable probability of reprisal against petition signers generally. They have not done that here. Though Plaintiffs have offered evidence in an attempt to show a reasonable probability of reprisal in their case, they have offered none supporting a general probability in all petition disclosure cases. Plaintiffs in *Reed* were similarly bereft of general evidence, which proved fatal to their facial challenge.[54] Thus, because Utah has a legitimate interest in requiring disclosure under section 20A-7-206(8), which is not counteracted by evidence of a serious burden on First Amendment rights as a general matter, the Court rejects Plaintiffs' facial challenge.

---

[52] *Reed*, 130 S. Ct. at 2819–20 (noting the ways in which disclosure could lead to the detection of fraud or mistake, and that the threat of fraud was evidenced by cases "of petition-related fraud across the country," but requiring no showing that disclosure had led to the discovery of fraud or mistake in Washington in the past).

[53] *Id.* at 2820 ("The signer is in the best position to detect these types of fraud, and public disclosure can bring the issue to the signer's attention.").

[54] *Id.* at 2821.

## II. PLAINTIFFS' AS APPLIED CHALLENGE

The same standard that governs facial challenges to compelled disclosure laws controls as applied challenges. As a first step, the Government must show that it has a legitimate interest that justifies the intrusion on the Petition signers' right to speak anonymously. If such a showing is made, Plaintiffs can still prevent disclosure if they can show the requisite probability of reprisal.

In its memorandum, the Government continues to assert its interest in electoral integrity as a sufficient justification to defeat an as applied challenge.[55] Plaintiffs attack this position, contending that, given the current frozen state of the petition, the Government at present has no legitimate interest in making the Petition information public.[56] Plaintiffs then go on to argue that even if the Government has a legitimate interest in compelling disclosure, Plaintiffs have offered sufficient evidence to establish a reasonable probability of reprisal against the Petition signers, such that any governmental interest in disclosure is overridden.[57]

As noted above, the Supreme Court determined in *Reed* that disclosure of petition signatures, as a general matter, protects the integrity of the electoral process by (1) combating fraud, (2) detecting invalid signatures, and (3) fostering government transparency and accountability.[58] Plaintiffs contend that in the case at hand, disclosure of the UEG Petition information will do none of the three.[59]

---

[55] (Defs.' Reply Mem. Supp. Mot. Vacate Prelim. Inj., 6.)
[56] (Pls.' Resp. Defs.' Mot. Vacate Prelim. Inj., 4.)
[57] *Id.* at 3.
[58] *Reed*, 130 S. Ct. at 2819–20.
[59] (Pls.' Resp. Defs.' Mot. Vacate Prelim. Inj., 18–19.)

At the outset, it seems clear that because the Lieutenant Governor has ordered the county clerks not to certify the Petition signatures until the dispute over reusing signatures collected for the 2010 ballot is resolved, neither combating fraud nor detecting invalid signatures are germane at this time. The Government can hardly expect help from the public in a task it is not currently undertaking. Thus, while the signatures remain dormant in the clerks' offices, so too must the fraud/invalidity detecting powers of the general public.

It is less clear whether the current state of the UEG Petition has any affect on the Government's general interest in fostering its own transparency and accountability. *Reed*, while acknowledging the validity of those interests, does little to define their contours.[60] However, because the Government has taken no action as of yet, it is hard to imagine how releasing the names of the Petition signers will do anything to increase the Government's own accountability or transparency. In effect, the Government has done nothing yet for which it could be held accountable, or which could even be considered non-transparent, besides deciding not to certify the signatures at present (a government action which, being based on a question of statutory interpretation, will not be rendered more transparent by the publication of the Petition signer's personal information). Yet, the Government claims that "governmental transparency and accountability . . . are ongoing interests regardless of whether this petition gets placed on the ballot."[61] The reasoning presumably undergirding this contention may have some validity when a procedure falls short of producing a law in a context outside of the unique circumstances of a referendum petition. When a bill dies in committee or at floor debate, for example, the public still

---

[60] *Reed*, 130 S. Ct. at 2820 ("Public disclosure also promotes transparency and accountability in the electoral process to an extent other measures cannot.").

[61] (Defs.' Reply Mem. Supp. Mot. Vacate Prelim. Inj., 9.)

has an interest in knowing what occurred in the legislative chambers. There, even though no product has materialized, the machinery of government has been at work, and allowing the public to access legislative history and voting records can certainly foster the transparency or accountability of government representatives based on their action with respect to any given proposal. But where the public has been the primary actor and the government has not yet taken action, the Defendants' argument loses force. Citizens knowing how other citizens "voted" on the Petition will not provide any assistance to the public in determining what their government is doing.

Notably, this characterization of the transparency and accountability interest is espoused in the brief submitted by the Government in opposition to the original restraining order request. There, Defendants reasoned that "[t]ransparency tends to ensure access to information concerning governmental activities and to allow public review of *government actions*. This will also allow government entities and the public to be able to challenge the mistakes they perceive or to be able to determine that *appropriate action and activities* were involved."[62] Similarly, the State of Washington, in support of its position in *Reed*, described the interest as conducive to keeping the public "'informed and therefore able to scrutinize *the government's work and decisions*.'"[63] As a factual matter, this was a sensible argument to make in *Reed*—by the time requests for publication of signatures had been made, the government had acted, certifying the signatures so that the initiative made it on to the 2010 ballot.[64] In contrast, here the Government has not yet acted (and may never

---

[62] (Defs.' Mem. Opp'n Prelim. Inj., 27) (Dkt. No. 25) (emphasis added).
[63] Brief for Respondent Sam Reed at 39, *Reed*, 130 S. Ct. 2811 (No. 09-559), 2010 WL 1250504, at *39 (emphasis added) (quoting *Kish v. Akron*, 846 N.E.2d 811, 816 (Ohio 2006)).
[64] *Reed*, 130 S. Ct. at 2816.

act) on the Petition signatures, making scrutiny of its work and decisions, at least for the present, a factual impossibility.

At oral argument, Defendants' counsel proposed that the government interest in transparency and accountability is served by releasing the Petition information because citizens could, as a result of release, determine whether their names had been fraudulently signed on the Petition by someone else. While it may be the case that citizens could detect such fraud upon release of the Petition information, the detection would not serve to make the *government* more transparent or accountable, but rather, its would-be fraudulent citizens. At best, release of the Petition information would serve the government interest in preventing identity theft. While a worthy goal, this is a government interest that was not discussed in *Reed*, much less approved.

In light of these considerations, the court finds that disclosure of the UEG Petition signatures, at this time, will not further Utah's interest in electoral integrity. Without a legitimate governmental interest, the Government has no justification for burdening Plaintiffs' First Amendment rights. Deciding the issue on these grounds alone, the court need not reach Plaintiffs' "reprisal" claim.

IT IS HEREBY ORDERED, for the reasons stated above, that:

1. Defendants' Motion to Vacate is DENIED.[65] Pending further order of this court, Defendants shall not administer, enforce, or otherwise follow the requirements of Utah Code, section 20A-7-206(8) as applied to the Petition. In particular, Defendants shall not release any of the names or other identifying information found on the initiative packets which have been submitted to them in connection with the "Government Ethics Reform" initiative petition that is spearheaded by Plaintiff Utahns for Ethical Government.

---

[65] Dkt. No. 46.

2. This ruling likewise applies to any other section or statute that would allow or require the release of such identifying information.

DATED this 21st day of March, 2011.

BY THE COURT:

_____
Clark Waddoups
United States District Court Judge